E-FILED
Friday, 18 September, 2026 10:51:22 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| **ROBERT K. KUHLMAN,**<br><br>**Plaintiff,**<br>**v.**<br><br>**OFFICER NICHOLAS HINES (Star #20257), SERGEANT SERENA CUNNINGHAM (Star #19306), LIEUTENANT JONATHAN McCAULEY (Star #7796), and the TOWN OF NORMAL, ILLINOIS, an Illinois municipal corporation,**<br><br>**Defendants.** | ) | **Case No. 24-cv-1065** |

**ORDER**

This matter is now before the Court on Defendants Town of Normal, Illinois, and Normal Police Department Officer Nicholas Hines, Sergeant Serena Cunningham, and Lieutenant Jonathan McCauley's (collectively "NPD officers") Motion for Summary Judgment. (D. 35). For the reasons set forth below, the Motion is GRANTED.

## I. BACKGROUND

### *A. Factual Background:*

On July 17, 2023, around 8:25 P.M., Carolyn Brown, Kuhlman's mother, contacted him and the police regarding a strange man at her residence, later identified as Joseph Hedrick. Brown is a widow who lives alone in a secluded, single-family home in Normal, Illinois. When Brown opened her inner door, she did not recognize Hedrick and immediately felt something was off based on his demeanor and appearance.

Hedrick asked Brown for water and to use her phone to call his grandparents. Brown agreed and left Hedrick outside while she retrieved these items. When she returned, Hedrick appeared very agitated. She gave Hedrick her phone, went back inside, and locked the door. Through the door, Brown could hear Hedrick becoming increasingly upset and yelling during the call. After a few minutes, Hedrick's grandparents hung up on him. When Brown went back out to get her phone, Hedrick was inconsolable. Finding his behavior alarming for an adult man, Brown gathered that he was unwell and asked him to leave. Hedrick, instead, sat on Brown's porch and continued to cry

Feeling she needed assistance, Brown called 911. NPD Officers Hines and Dixon[1] were dispatched in response. Brown then called Kuhlman and waited in her home for them to arrive.[2] Kuhlman left with his son Ian, who lived a few minutes away, immediately went to help Brown. Kuhlman and Brown spoke on the phone again while Kuhlman was driving to her home. Brown, who sounded worried, told him "he's still here, please hurry." (D. 35-5, p. 7). At that time, Kuhlman possessed a valid Illinois Firearm Owners Identification Card ("FOID Card"), 430 ILCS 65/1, *et seq.*, and an Illinois Firearms Concealed Carry Act license, 430 ILCS 66/1, *et seq.* ("CCL"). These permitted him to legally carry a concealed, loaded firearm in his vehicle, which he did on the date of this incident.[3]

---

[1] At the time Officer Hines was a probationary police officer with the Normal Police Department. A probationary officer is a newly hired officer undergoing a mandatory trial and training period, which lasts 18 months. During this time, they attend the police academy and complete field training, after which they earn full-fledged "permanent" officer status. Officer Dixon was in the NPD Field training program which permitted him to have a field trainee officer, such as Officer Hines, with him.

[2] On the way to Brown's house, Officer Hines was advised that the man on her porch was likely Joseph Hedrick and that he had shown up the fire station earlier that day because he did not want to stay at his aunt and uncles' house and wanted to go to his grandparents. The call was also changed from a trespass to a wellness check. The recording of Brown's 911 call was deleted prior to discovery and is no longer available.

[3] Under Illinois' Conceal Carry Act, an Illinois resident is authorized to carry a load or unloaded firearm on his person or next to him in a car, as long as it is fully or partially concealed and he meets the qualified set forth in the Act. 430 ILCS 66/1 *et seq.* The Seventh Circuit has affirmed "that the Second Amendment entitles qualified person to carry guns outside" and that the "the constitutional right to 'keep and bear' arms means that states must permit law-abiding

When Kuhlman arrived, he saw Hedrick sitting on the porch moving his hands and making indistinguishable noises. Kuhlman grabbed his concealed handgun, got out of the truck and yelled at Hedrick to get off the porch. On Kuhlman's order, Hedrick—who was still crying—picked up a white bag off the ground and started walking down the accessibility ramp toward Kuhlman. Not knowing what was in the bag, Kuhlman yelled at Hedrick to put the bag down. Hedrick then reached toward the bag with his other hand. Not knowing if the bag contained a weapon, Kuhlman testified that he aimed his gun at Hedrick for the first time. *Id.*[4] Hedrick then stopped, dropped the bag he was carrying, and raised his hands.

Within minutes, if not seconds, Officer Hines arrived at the scene and found Hedrick and Kuhlman in this posture. Officer Hines ordered Kuhlman to drop the gun. Kuhlman immediately removed the gun's magazine, placed it on the ground, and stepped back with his hands raised. Officer Hines then spoke briefly with Kuhlman and Hedrick. At Kuhlman's request, Officer Hines removed the gun from the open and returned it to Kuhlman's truck.

Officer Hines then interviewed Kuhlman, Brown, and Ian, who were now standing together in Brown's front yard. Brown confirmed that Hedrick had not acted violently or aggressively toward her. She did, however, express that she was afraid that he might because he was "inconsolable" and "totally out of control." (D. 35-2). Officer Hines then asked Kulhman, "did he make any movements towards you?" and Kuhlman replied: "I told him to come down, I drew. [Brown] was acting scared on the phone, and she was by herself and so as soon as I got out of the car I told him to come down away from the that porch, had him come right here and told him to

---

and mentally healthy persons to carry loaded weapons in public." *Culp v. Madison*, 840 F.3d 400, 401 (7th Cir. 2016) (quoting *Berron v. Illinois Concealed Carry Licensing Review Bd*., 825 F.3d 843, 845 (2016)).

[4] Brown, on the other hand, testified that Kuhlman had his gun drawn when he got out of the truck and immediately pointed it at Hedrick. (D. 35-1, p. 35). She then clarified that what she meant when she said Kuhlman "drew his gun" was that he had it in his hand when he got out of his truck and that he was pointing it forward. *Id.* at pp. 64–65. Regardless, it is undisputed that Kuhlman or Brown were never asked by officers when Kuhlman first pointed his gun at Hedrick.

drop the bag." *Id.* Although Hedrick's erratic behavior and refusal to leave had been reported, Kuhlman never expressly told Officer Hines that he only pointed his gun at Hedrick after it looked like he was starting to reach into his bag.

At this time, other officers arrived on the scene. These officers determined that Hedrick had run away from his aunt and uncle's home and was experiencing an emotional crisis. They also believed that Hedrick likely had some mental disabilities. As a result, emergency medical services had been contacted to take Hedrick to the hospital. While waiting for the ambulance, the officers ask Hedrick if he wanted to press charges against Kuhlman for aggravated assault. Hedrick told them no and that Kuhlman "had every right because [he] was scarring his mom." *Id.*

Officer Hines then called his supervisor, Lieutenant McCauley, who was off scene, to review the situation. On Lieutenant McCauley's recommendation, Officer Hines informed Kuhlman that Hedrick did not want to press charges against him for aggravated assault but that he should review Illinois law regarding the use of deadly force. Though Lieutenant McCauley also mentioned during the phone call putting in a clear and present danger ("CPD") report pursuant to Illinois' Firearm Owners Identification Card Act ("Act"), 430 ILCS 65/1, *et seq.*, this was not mentioned to Kuhlman. Kuhlman was then released from the scene with his gun. He was never arrested, detained, or charged as a result of this incident.

When Officer Hines returned to the NPD, he and Lieutenant McCauley further discussed submitting a CPD report. The CPD reporting process is intended to prevent individuals who pose a "clear and present danger" from having access to firearms or firearm ammunition by revoking the individual's FOID Card. (D. 35-3, p. 25). Under the Act, "clear and present danger" as "a person who…demonstrates threatening physical or verbal behavior, such as violent, suicidal, or assaultive threats, actions, or other behavior, as determined by…law enforcement official." 430

ILCS 65/1.1. The Act provides that if a law enforcement official determines that a person poses a clear and present danger to himself or others, "then the law enforcement official...shall, within 24 hours of making the determination, notify the Illinois State Police ["ISP"] that the person poses a clear and present danger." *Id.* at 65/8.1(d)(2).

CPD reports are then used by the ISP "to identify persons, who if granted access to a firearm or ammunition, pose an actual, imminent threat of substantial bodily harm to themselves or others that is articulable and significant, or who will likely act in a manner dangerous to public safety." (D. 35-3, p. 2). The Act also states that law enforcement officials shall not be held civilly liable for making or not making the CPD notification required, except for willful and wanton misconduct. (D. 35-3, p. 2); *see also* 430 ILCS 65/8.1.

After reviewing the facts and Illinois law,[5] Officer Hines and Lieutenant McCauley determined they were required to submit a CPD report notifying the ISP of the events involving Kuhlman. Despite not arresting or charging him, they determined Kuhlman had committed aggravated assault and had demonstrated that he was an "assaultive threat," because he had used his firearm inappropriately *i.e.* in an unlawful manner.

Lieutenant McCauley's shift ended before Officer Hines completed the CPD report. Thus, Sergeant Cunningham, who was the supervisor still on the shift, was responsible for reviewing the report for grammatical errors and completeness before signing off on it. In the report's narrative, Officer Hines detailed his CPD determination as follows:

> On Monday, 07/17/2023 at approximately 2026 hours officers were called to [Brown's residence] in reference to a check wellbeing. Officers were advised that there was a man on a woman's porch.
>
> Upon my arrival, I observed [Kuhlman] pointing a handgun at the subject…[who] was standing with his hand up and crying. At no point did I see [Hedrick] as a threat

[5] The Illinois statutes reviewed were: 735 ILCS 5/7-1; 735 ILCS 5/7-2; 735 ILCS 5/7-3; 735 ILCS 5/7-5 (h)(2); 735 ILCS 5/7-9; and 735 ILCS 5/7-19.

> in the couple seconds I saw [Kuhlman] point the firearm at him. I told [Kulhman] to put the gun down, which he did. [Kuhlman] then complied with all other commands.
>
> [Kuhlman] later told me that he was in fear of his grandmother's [*sic*] safety. He was also worried [Hedrick] was having a mental breakdown and he did not know if [Hedrick] was on drugs. [Hedrick] also had a white shopping bag with him with unknown items inside.

(D. 35-3, p. 3). The CPD report also listed "Aggravated Assault" under "Charges," despite no charges being filed. *Id.* at p. 2. A few weeks later, the ISP notified Kuhlman and the NPD that Kuhlman's FOID Card and CCL had been revoked. On August 12, 2023, Kuhlman surrendered his FOID, CCL, and firearm to the NPD. (D. 35-3, p. 22).

***B. Procedural Background:***

As a preliminary matter, in Kuhlman's Response to Defendants' Motion for Summary Judgment he concedes summary judgment in favor of Defendant Sergeant Cunningham. (D. 42, p. 3). Accordingly, summary judgment is GRANTED in her favor, and she is terminated as a party to this case.

Turning next to Kuhlman's Amended Complaint, Counts I and II are brought against Officer Hines and Lieutenant McCauley in their individual capacities. Count I is brought under 42 U.S.C. § 1983 and alleges the officers wrongfully submitted the CPD report depriving Kuhlman of his rights under the Second Amendment of the U.S. Constitution. Kuhlman seeks compensatory and punitive damages, costs, and attorney's fees under 42 U.S.C. § 1988 on Count I. Count II alleges willful and wanton conduct against the officers under Illinois law for submitting the CPD report knowing it would strip Kuhlman of his FOID, CCL, and Second Amendment rights. Kuhlman seeks compensatory damages and other relief on Count II. Count III seeks indemnification against the Town of Normal under 745 ILCS 10/9-102 for any judgment or settlement arising from the officers' act arising within the scope of their employment.

Defendants have now moved for summary judgment under Federal Rule of Civil Procedure 56, arguing that Kuhlman's Second Amendment rights have not been violated and that there was no violation or willful and wanton conduct by the officers in submitting the CPD report. Defendants also raise qualified immunity and Illinois Tort Immunity Act defenses and contend that the Town of Normal cannot be liable absent officer liability. The Motion is fully briefed, and this Order follows.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In seeking a grant of summary judgment, the moving party must identify specific evidence that shows there is no genuine issue of material fact or "that an adverse party cannot produce admissible evidence to support a fact." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)–(2). We draw from the evidence all reasonable inferences in favor of Kuhlman. *Palmer v. Franz*, 928 F.3d 560, 565 (7th Cir. 2019).

To survive summary judgment, Kuhlman "must be able to show that a reasonable jury could return a verdict in [his] favor." *Lesiv v. Ill. Central R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (quoting *Benuzzi v. Board of Education of City of Chi.*, 647 F.3d 652, 662 (7th Cir. 2011)). If Kuhlman fails "to establish the existence of an element essential to his case, and on which he will bear the burden of proof at trial, summary judgment must be granted." *Id.* (internal quotations omitted) (quoting *Celotex Corp.*, 477 U.S. at 322).

## III. DISCUSSION

### *A. Count 1—Second Amendment:*

Under Count I, Kuhlman alleges that Officer Hines and Lieutenant McCauley violated Second Amendment, as applied to the states *via* the Fourteenth Amendment, when they wrongfully submitted a false or misleading CPD report to ISP. (D. 27, p. 27). Specifically, Kuhlman claims that the CPD report mischaracterized the incident as a well-being check , omitted the context of his mother's call, omitted that Officer Hines' assessment of Hedrick's risk level was based on limited information, and falsely stated that Kuhlman was charged with aggravated assault.

Defendants move for summary judgment arguing that the CPD report was proper because Kuhlman's unlawful use of his weapon constituted an aggravated assault or "assaultive threat." (D. 35, pp. 10). In support they state that Kuhlman exited his car and pointed his gun at Hedrick before he assessed Hedrick who had not hurt or threatened anyone and had obeyed all of Kulman's commands. *Id.* Based on these circumstances, the officers determined that Kuhlman was a clear and present danger, which they were authorized to do under 430 ILCS 65/8.1(d)(2). *Id.* They also claim that § 65/8.1(d)(2) of the Act required them to report Kuhlman to the ISP within 24 hours of making that determination.

Defendants also contend that they are entitled to summary judgment because § 1983 requires personal involvement and that the officers were not involved in the ISP's determination to revoke Kuhlman's FOID card. *Id.* Put differently, there is no evidence that the officers violated Kuhlman's Second Amendment rights because any FOID revocation decision was made by the ISP. (D. 35, pp. 8–11). They also assert that "there is no evidence to suggest that Defendants believed that the revocation of Plaintiff's FOID card was a foregone conclusion upon submitting the [CPD] report." *Id.* Thus, Defendants claim that they cannot be held liable for the revocation of Kuhlman's FOID card, that they did not violate Kuhlman's Second Amendment rights, and that

summary judgment should be granted in Officer Hines and Lieutenant McCauley's favor on Count I. *Id.*

Alternatively, Defendants argue that they are entitled to qualified immunity because Kuhlman failed to show that the officers reasonably should have known that their CPD report violated his Second Amendment rights, when they had reason to believe that Kuhlman had committed aggravated assault by pointing his gun at Hedrick. *Id.* at pp. 10–11. Defendants also argue that they are entitled to discretionary immunity under 2-201 of the Illinois Tort Immunity Act. *Id.* at 12 (citing 745 ILCS 10/2-201).

*1. Qualified Immunity:*

Because Kuhlman's Second Amendment claim against Officer Hines and Lieutenant McCauley cannot survive if they are entitled to qualified immunity, the Court will begin and end its discussion here. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (directing courts to resolve immunity questions "at the earliest possible stage in litigation," to give full effect to the underlying policy of the defense: protecting government officials from litigation and liability).

Once the defense of qualified immunity has been raised in a case, "it becomes the plaintiff's burden to defeat it." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021). "To overcome a defendant's invocation of qualified immunity, a plaintiff must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The court has discretion "to decide which element of the qualified immunity defense to address first. If the answer to either question is no, the defendant official is entitled to qualified immunity." *Muhammad v. Pearson*, 900 F.3d 898, 904–05 (7th Cir.

2018). Because the Court finds that Kuhlman cannot meet his burden under prong two, it will not discuss prong one.

"Government officials enjoy qualified immunity from suit under § 1983 unless their conduct violates clearly established law." *Zorn v. Linton*, 607 U.S. ----, 146 S.Ct. 926, 930 224 L.Ed.2d. 400 (Mar. 23, 2026) (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 142 S.Ct. 4, 211 L.Ed.2d 164 (2021) (*per curiam*). A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* A right is not clearly established if existing precedent does not place the constitutional question "'beyond debate.'" *Id.*

Generally, "to find that a right is clearly established, courts "need to identify a case where an officer acting under similar circumstances ... was held to have violated the Constitution." *Id.* (quoting *Escondido v. Emmons*, 586 U.S. 38, 43, 139 S.Ct. 500, 202 L.Ed.2d 455 (2019) (*per curiam*) (internal quotation marks omitted)). "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018)). Ultimately, the doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law . . . [if] officers of reasonable competence could disagree on the issue [of whether or not an action was constitutional], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Kuhlman asserts that the dispositive question is whether it was clearly established that Defendants' intentional use of false information, and omission of favorable evidence, in a CPD report amounted to a Second Amendment violation. Kuhlman, however, has not pointed to any

existing precedent establishing that officers, acting under similar circumstances, were held to violate the Second Amendment.

Instead, he first cites to *Brokaw v. Mercer Cty*., 235 F.3d 1000, 1012 (7th Cir. 2000), *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988), and *Jones v. City of Chicago*, 856 F.2d 985, 993–94 (7th Cir. 1988), in apparent support for his argument that Officer Hines and Lieutenant McCauley can be held individually liable under § 1983 because they knew or should have known that the CPD report would lead to the revocation of his FOID card. None of these cases, however, involve Second Amendment claims or set forth facts where an officer was held individually liable under § 1983 while acting under similar circumstances. *See Brokaw*, 235 F.3d 1000 (involving Fourth Amendment and due process claims by a minor arising from his removal from his parents' home based on allegedly false neglect allegations made by relatives and acted on by county officials); *Hand*, 838 F.2d 1420 (discussing the different causation standards for false arrest and malicious prosecution claims); *Jones*, 856 F.2d 985 (court held that the prosecutor's decision to charge Jones did not break the chain of causation, as the police officers had deliberately supplied misleading information and the City of Chicago was liable under § 1983 due to the custom of maintaining street files, which denied Jones due process). Moreover, the only evidence Kuhlman presented regarding the officer's knowledge that revocation of his FOID card was likely, was an Illinois State Police press release issued in November 2023, months after they submitted the CPD report.

Kuhlman also relies on non-precedential, unreported cases from the Southern District of Indiana, *McCalister v. Stevens*, 2019 WL 4749972 (S.D. Ind. 2019), and the Northern District of Illinois, *Daly v. City of Stickney*, 2016 WL 354172 (N.D. Ill. Jan. 27, 2016), to support the proposition "that the right to not to have one's freedoms and liberty's taken away by false reporting has been long established." (D. 42, pp 17–19). Again, neither of these cases involved the Second

Amendment claims, procedures analogous to CPD reports or officers acting in similar circumstances.

*McCalister* involves a Fourth Amendment false arrest claim after an officer submitted an alleged false report. (D. 42, p. 4). In that case, the court held that it had been long established that an officer must have probable cause to conduct a search or seizure under the Fourth Amendment, and that such probable cause could not be satisfied through intentionally false, or otherwise incompetent, reports. *McCalister*, 2019 WL 4749972, at *2 (holding qualified immunity applies if arguable probable cause exists to support the filed report, and there is arguable probable cause when "a reasonable officer could have mistakenly believed that probable cause existed") (internal citations omitted).

*Daly* is similarly unhelpful to Kuhlman. That case involved the removal of minor children and brought claims under the Fourth Amendment alleging conspiracy to falsely arrest and unreasonable seizure, and deprivation of his interests in familial association, privacy, and autonomy without due process. *See Daly,* 2016 WL 354172. Again, the Court fails to see how this case, or any of the cases cited by Kuhlman, sets forth relevant precedent with a "high degree of specificity" so that a reasonable officer would interpret it as establishing conduct that violates the Fourth Amendment also violates the Second Amendment.

Kuhlman urges the Court to replace the Fourth Amendment with the Second Amendment when reviewing this precedent given that the two are both fundamental rights. (D. 42, p. 19). But this very rescripting is prohibited under qualified immunity. *Zorn* 146 S.Ct. at 930 224 (stressing that the precedent "must define the right with a 'high degree of specificity'"). That is particularly true here where the courts have developed markedly different frameworks for evaluating Fourth Amendment and Second Amendment claims. One's right to be free from unreasonable search and

seizure under the Fourth Amendment is limited by the existence of probable cause. One's right to bear arms under the Second Amendment, however, is subject to different limitations including one's age, mental health, and previous criminal history. *See Horsley v. Trame*, 808 F.3d 1126, 1131 (7th Cir. 2015). The Act, which Defendants attempted to comply with here, is one of those limitations. As discussed, the Act required Defendants to determine whether Kuhlman was a clear and present danger and, if so, submit a CPD report to ISP within 24 hours of making the determination. 430 ILCS at 65/8.1(d)(2).

Further, courts have followed a different analytical path when assessing Second Amendment violations, which generally includes facial or as-applied challenges to statutes that may result in the invalidation of laws or the granting injunctive relief, neither of which Kuhlman is seeking here.[6] *See United States v. Skoien*, 614 F.3d 638, 645 (7th Cir. 2010); *see also Berron v. Ill. Concealed Carry Licensing Rev. Bd.*, 825 F.3d 843, 846 (7th Cir. 2016); *White v. Illinois State Police*, 15 F.4th 801, 812 (7th Cir. 2021). As Kuhlman notes, these cases are not informative of the constitutionality of Defendants' actions. (D. 54, p. 22). Ultimately, Kuhlman has not provided any case precedent interpreting when a law enforcement official's actions violate the Second Amendment in the context of submitting a CPD report, which they are legally required to do, when they believe a person presents a clear and present danger.

While the Court questions the quality of judgment exercised by Officer Hines and Lieutenant McCauley in writing and submitting the CPD report, that is not the issue before this Court. For the reasons above, the Court finds that qualified immunity applies to Count I.

***B. Counts II and III-State Law Claims:***

---

[6] Despite not being factually similar, Kuhlman relies on these cases to argue the officers are not entitled to qualified immunity. (D. 42, p. 20) (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); and *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)).

Count II alleges willful and wanton conduct against Officer Hines and Lieutenant McCauley under Illinois law and Count III seeks indemnification against the Town of Normal under 745 ILCS 10/9-102 for any judgment or settlement arising from the officers' act arising within the scope of their employment. The Court declines to exercise its supplemental jurisdiction over these remaining state law claims, because it has found that Officer Hines and Lieutenant McCauley are entitled to qualified immunity on the only claim over which it had original jurisdiction. *See Ross v. Board of Educ. of Twp. High Sch. Dist.* # 211, 486 F.3d 279, 285 (7th Cir. 2007); 28 U.S.C. § 1367(c)(3). "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *East-Miller v. Lake Cnty Highway Dep't*, 421 F.3d 558, 564–65 (7th Cir. 2005) (quoting *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999)). Accordingly, Counts II and III are dismissed without prejudice.

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' [35] Motion for Summary Judgment on Count I, and declines to exercise supplemental jurisdiction over the remaining state law claims in Counts II and III of the Amended Complaint. Accordingly, Count I is DISMISSED WITH PREJUDICE, and Counts II and III are DISMISSED WITHOUT PREJUDICE for lack of jurisdiction.

ENTERED September 18, 2026.

/s/ Michael M. Mihm
Michael M. Mihm
United States District Judge